# Exhibit G

1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF NEW JERSEY

2

    IN RE: PROTON-PUMP INHIBITOR    : MDL No. 2789
3   PRODUCTS LIABILITY              : Honorable
    LITIGATION (NO. II)             : Claire C. Cecchi
4   _____:_____

    THIS DOCUMENT RELATES TO:       :
5   Civil Action No.: 2:17-cv-06124 :
    FREDDY BALES,                   :
6                                   :
              Plaintiff,            :
7   vs.                             :
                                    :
8   ASTRAZENECA PHARMACEUTICALS LP, :
    et al.,                         :
9                                   :
              Defendants.           :
10  _____:

11  (Complete case caption on following pages.)

12

13          REMOTE VIDEOCONFERENCE DEPOSITION OF

14               JOHN C. SEELY, DVM

15              10:02 a.m. to 3:54 p.m.

16           Wednesday, September 8, 2021

17  _____

18          Taken by the Plaintiffs via Zoom

19   The witness was located in Durham, North Carolina

20

21                     -  -  -

22      Reported by Sophie Brock, RPR, RMR, RDR, CRR

23           GOLKOW LITIGATION SERVICES

          877.370.3377 ph | 917.591.5672 fax

24               deps@golkow.com

John C. Seely, DVM

```
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF NEW JERSEY
 2
     IN RE: PROTON-PUMP INHIBITOR    : MDL No. 2789
 3   PRODUCTS LIABILITY             : Honorable
     LITIGATION (NO. II)            : Claire C. Cecchi
 4   _____:_____
     THIS DOCUMENT RELATES TO:       :
 5   Civil Action No.: 2:17-cv-06124 :
     FREDDY BALES,                   :
 6                                   :
            Plaintiff,               :
 7   vs.                             :
                                     :
 8   ASTRAZENECA PHARMACEUTICALS LP, :
     et al.,                         :
 9                                   :
            Defendants.              :
10   _____:
     Civil Action No.: 2:17-cv-02475 :
11   DAVID FOSTER,                   :
                                     :
12          Plaintiff,               :
     vs.                             :
13                                   :
     ASTRAZENECA PHARMACEUTICALS LP, :
14   et al.,                         :
                                     :
15          Defendants.              :
     _____:
16   Civil Action No.: 2:18-cv-03159 :
     STEVE KERSCH,                   :
17                                   :
            Plaintiff,               :
18   vs.                             :
                                     :
19   ASTRAZENECA PHARMACEUTICALS LP, :
     et al.,                         :
20                                   :
            Defendants.              :
21   _____:
22
23
24
```

```
 1  _____
    Civil Action No.: 2:17-cv-00212  :
 2  KIMBERLY LEE,                     :
                                      :
 3          Plaintiff,                :
    vs.                               :
 4                                    :
    ASTRAZENECA PHARMACEUTICALS LP,   :
 5  et al.,                           :
                                      :
 6          Defendants.               :
    _____:
 7  Civil Action No.: 2:17-cv-13727   :
    DIANE NELSON,                     :
 8                                    :
            Plaintiff,                :
 9  vs.                               :
                                      :
10  ASTRAZENECA PHARMACEUTICALS LP,   :
    et al.,                           :
11                                    :
            Defendants.               :
12  _____:
    Civil Action No.: 2:19-cv-00850   :
13  JAMES RIEDER,                     :
                                      :
14          Plaintiff,                :
    vs.                               :
15                                    :
    ASTRAZENECA PHARMACEUTICALS LP,   :
16  et al.,                           :
                                      :
17          Defendants.               :
    _____:
18
19
20
21
22
23
24
```

John C. Seely, DVM

```
 1                    REMOTE APPEARANCES
 2   ON BEHALF OF THE PLAINTIFFS:
 3            ANAPOL WEISS
              One Logan Square
 4            130 North 18th Street
              Suite 1600
 5            Philadelphia, Pennsylvania 19103
              Telephone: (866) 930-2217
 6            By:   TRACY FINKEN MAGNOTTA, ESQ.
                    tfinken@anapolweiss.com
 7                  CATELYN MCDONOUGH, ESQ.
                    cmcdonough@anapolweiss.com
 8
              - and -
 9
              DOUGLAS & LONDON, P.C.
10            59 Maiden Lane, 6th Floor
              New York, New York 10038-4646
11            Telephone: (212) 566-7500
              By:   BESS DEVAUGHN, ESQ.
12                  bdevaughn@douglasandlondon.com
13
14   ON BEHALF OF THE DEFENDANT ASTRAZENECA PHARMACEUTICALS
     LP:
15
              ICE MILLER LLP
16            One American Square, Suite 2900
              Indianapolis, Indiana 46281
17            Telephone: (317) 236-2100
              By:   ALLYSON EMLEY, ESQ.
18                  allyson.emley@icemiller.com
19
20   ON BEHALF OF THE DEFENDANT TAKEDA PHARMACEUTICALS CO.:
21            TUCKER ELLIS LLP
              233 South Wacker Drive, Suite 6950
22            Chicago, Illinois 60606
              Telephone: (312) 624-6300
23            By:   ANDREA M. GLINKA PRZYBYSZ, ESQ.
                    andrea.przybysz@tuckerellis.com
24
```

```
 1   ALSO PRESENT REMOTELY:

 2           Emily Sy - Takeda Pharmaceuticals Co.

 3

 4   VIDEOGRAPHER:

 5           Kristalyn Duran

 6

 7   TRIAL TECHNICIAN:

 8           Dan Lawlor

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                  INDEX OF EXAMINATIONS
 2                                                PAGE
 3   BY MS. FINKEN  . . . . . . . . . . . . . . . . 5
 4
 5                   INDEX OF EXHIBITS
 6   NUMBER              DESCRIPTION            MARKED
 7   Exhibit 1    Plaintiff's Notice of Oral  . . . . . .29
                  Videotaped Deposition and
 8                Associated Subpoena Duces Tecum
                  of John Seely
 9
     Exhibit 2    Handwritten notes and marked-up . . . .33
10                pages titled "497-018 Notes"
11   Exhibit 3    Statement of Compensation for . . . . .40
                  Dr. John Seely
12
     Exhibit 4    Materials Considered List . . . . . . .46
13
     Exhibit 5    Expert opinion reviews and  . . . . . .48
14                reports
15   Exhibit 6    National Toxicology Program . . . . . .90
                  Nonneoplastic Lesion Atlas,
16                "Kidney, Renal Tubule - Dilation"
17   Exhibit 7    Article from Toxicologic  . . . . . . 132
                  Pathology titled "Regulatory
18                Forum Opinion Piece*: Dispelling
                  Confusing Pathology Terminology:
19                Recognition and Interpretation of
                  Selected Rodent Renal Tubule
20                Lesions," by John Curtis Seely
                  and Kendall S. Frazier
21
     Exhibit 8    Image for Rat 13485, described  . . . 164
22                as "autolysis tubules, not real
                  necrosis."
23
     Exhibit 9    EPL 497-019, "Unaudited Metadata  . . 171
24                - 126-049"
```

1          A.  Yes.

2          Q.  Did you provide diagnostic criteria for

3     vacuolation in any of the other appendices?

4          A.  Yes, I did.

5          Q.  Okay.  Doctor, if we can go to Study

6     A-29-1977, which is, I believe, page 764 of the PDF.

7     This is a rat study.

8          A.  Okay.  "Two-Year Oral Oncogenicity Study."

9     A-29-1977.  Got it.

10         Q.  Okay.  And looking at page 4 of your report,

11    it indicates that there were multiple dose groups in

12    this study.  There was a 5 mg/kg/day dose group,

13    25 mg/kg/day dose group, 75, and 150.  Do you see

14    that?

15         A.  And two vehicle control groups.

16         Q.  Correct.  And is it fair to say that you only

17    reviewed the 150 milligram dose group in this study?

18         A.  Let me look at the summary tables.

19              I reviewed both control groups and group 5.

20         Q.  Okay.  Looking at the individual animal data

21    on page -- hold on one second -- on page 16 of

22    Appendix B for Study A-29-1977 --

23         A.  Can you bring that up on your screen?

24         Q.  Sure.

1          A.   Because I don't have that data in front of

2     me.

3          Q.   Okay.  It's animal 13485.

4               Do you see it there, Doctor?

5          A.   Yes.

6          Q.   And you indicate here that this was an

7     unscheduled death, treatment day 274.  And it says

8     "The following tissues are unremarkable: kidneys."  Do

9     you see that?

10         A.   Yes.

11         Q.   Okay.  Now, looking at the images that you

12    provided to us through counsel yesterday --

13               MS. FINKEN:  And, Daniel, I believe

14    that that was just sent to you, the image for 13485.

15    If you can pull that up.

16               THE WITNESS:  I see.

17    BY MS. FINKEN:

18         Q.   Okay.  You see that?

19               And this particular image is titled

20    "Figure 11 - Rat 13485, A-29-1977," and it says

21    "autolytic tubules, not real necrosis."

22               Do you see that?

23         A.   Yes.

24         Q.   And when you're referring to autolysis, or

John C. Seely, DVM

1    autolytic tubules, what are you referring to?

2        A.  So you -- Counsel, you see the circular

3    structures; is that correct?

4            There's, like, one, two, three, four, five,

5    six, seven of them.  Spherical.

6        Q.  Yes.

7        A.  Those are glomeruli.

8            The autolytic tubules are surrounding the

9    glomeruli.  They're very hazy.  The cellular contours

10   and cell membranes are very indistinct.  And all those

11   changes are indicative of degeneration -- postmortem

12   degeneration.

13       Q.  Okay.  So in your report, when you have the

14   individual animal findings for this particular rat,

15   13485, and you indicate that the tissues are

16   unremarkable, was that an error in your report?

17       A.  No.  They're unremarkable.

18       Q.  Okay --

19       A.  In my studies, I don't code out autolysis --

20       Q.  Okay.  So if you --

21       A.  -- because -- Counsel, because it's a

22   non-lesion.

23               MS. PRZYBYSZ:  Go ahead.

24               THE WITNESS:  Go ahead.

John C. Seely, DVM

1    BY MS. FINKEN:

2        Q.  So for purposes of this image that you

3    created in July that you labeled "autolysis tubules,

4    not real necrosis," you believe that that's consistent

5    with the tissues being unremarkable that you recorded

6    in your individual data listing for Rat 13485 in your

7    report?

8        A.  Yes.

9        Q.  Why don't you code for autolysis when you are

10   reviewing images in your report?

11       A.  Because I consider autolysis not a lesion.

12               MS. FINKEN:  You can take that down.

13   Did we mark that as an exhibit?  I'm sorry.  Let's

14   mark that image as Exhibit 8 to Dr. Seely's

15   deposition.

16       (Exhibit No. 8 was marked for identification.)

17   BY MS. FINKEN:

18       Q.  In relation to the images that your counsel

19   provided to us yesterday, it appears that there were

20   21 images that had been provided from the studies --

21   or the study slides that you had reviewed for purposes

22   of your report; and those images had been taken in

23   July of this year after your report had been produced.

24               Out of those 21 images, it looks like eight

John O. Seeley, DVM

1    of the images were from control animals; is that

2    correct?

3                    MS. PRZYBYSZ:  Object to the form.

4                    THE WITNESS:  That's correct.  At least

5    eight.  I think they were all from control animals.

6    BY MS. FINKEN:

7        Q.  Okay.  And did you -- you had indicated that

8    the purposes of taking those images in July of 2021

9    was at the request of counsel; correct?

10       A.  That's correct.

11       Q.  So is it fair to say that this was not a

12   re-review of your original findings?

13       A.  Could you rephrase that, please?

14       Q.  You weren't doing an additional review of

15   your original findings; correct?

16       A.  Correct.

17       Q.  When you reviewed the two-year studies, you

18   had indicated that you only reviewed the high-dose

19   group and the controls; correct?

20       A.  It depends on the study.  If there were no

21   test article-related findings in the high-dose,

22   I didn't read the lower-dose groups.  And I made that

23   clear in my reports.  That's called a read-down

24   process.

1     Q.  Okay.  How were you able to determine whether

2  there were any dose-dependent changes in that

3  particular study if you didn't review all of the

4  groups?

5     A.  Because if you see nothing at the high dose,

6  you're not concerned about a dose-related effect.

7     Q.  Well, isn't there instances where you may not

8  see an effect at the high-dose group for perhaps

9  bioavailability or some other reason where you may see

10  an effect in the intermediate dose groups?

11            MS. PRZYBYSZ:  Objection.  Lack of

12  foundation.  Calls for speculation.

13            THE WITNESS:  It's possible but not

14  probable.

15  BY MS. FINKEN:

16     Q.  Is this the same level of review that you

17  would conduct if you were undertaking a review of

18  slides for a governmental agency when evaluating for

19  carcinogenic effects?

20            MS. PRZYBYSZ:  Object to the form.

21            THE WITNESS:  Did you say a

22  governmental facility?

23  BY MS. FINKEN:

24     Q.  Yes.

John O'Seery, DVM

```
 1        A.  It depends on the study protocol.  If they

 2   only ask me to read control and high-dose and then a

 3   read-down to lower dose, that's what I do.  If they

 4   ask me to read the entire study, I read the entire

 5   study.

 6        Q.  And is that what occurred here?  You were

 7   asked to review the high-dose and control groups

 8   instead of the entire study?

 9             MS. PRZYBYSZ:  Object to the form, and

10   to the extent it calls for communications with

11   counsel.

12             THE WITNESS:  Can you rephrase that,

13   please?

14   BY MS. FINKEN:

15        Q.  Okay.  Is that what you were requested to do

16   here by Dr. Hardisty, to review the high dose and the

17   control groups and not review the entire study?

18             MS. PRZYBYSZ:  Object to the form.

19             THE WITNESS:  Again, Counsel, I'm

20   having a difficult time understanding your question.

21   BY MS. FINKEN:

22        Q.  Okay.  Well, you had indicated that for a

23   governmental agency, it would depend on the study

24   protocol whether you reviewed the high-dose and the
```

John Seely, DVM

 1    control groups versus the entire study; right?

 2        A.  That's correct.

 3        Q.  Okay.  And is that what you were asked to do

 4    here in this case: review the high-dose and the

 5    control groups as opposed to the entire study?

 6            MS. PRZYBYSZ:  Object to the form, to

 7    the extent it calls for any information discussed with

 8    counsel.

 9            THE WITNESS:  During the review of the

10    slides, it became evident to me that, because of time

11    restraints, it was not going to be possible for me to

12    review all the slides; so I contacted our attorneys

13    and contacted Takeda and presented what I thought was

14    a perfectly acceptable way to read the study.  And

15    everyone agreed with that, that --

16            MS. PRZYBYSZ:  I'm going to stop you

17    from answering the rest of that.

18            THE WITNESS:   Okay.

19    BY MS. FINKEN:

20        Q.  Did you ever request from -- strike that.

21            Did you ever request to review additional

22    study-related data when formulating your

23    conclusions -- beyond the slides?

24            MS. PRZYBYSZ:  Object to the form.

John C. Seely, DVM

1    Asked and answered, like, 40 times.

2                  THE WITNESS:  Yeah.  No, I never

3    requested extra material.

4                  MS. FINKEN:  Okay.  Doctor, just give

5    me one more minute to go through my notes, and I may

6    be done.

7           Let's just go off the record for one minute,

8    and I may be wrapping it up.

9                  THE VIDEOGRAPHER:  The time is

10   3:25 p.m.  Off the record.

11      (Off the record from 3:25 p.m. to 3:44 p.m.)

12                 THE VIDEOGRAPHER:  The time is

13   3:44 p.m.  Back on the record.

14   BY MS. FINKEN:

15      Q.  Okay.  Doctor, looking at your report again

16   that we had just pulled up, Appendix B of Study

17   A-29-1977 -- it's the one we were looking at right

18   before the break --

19      A.  A-29-1977.  Yes --

20      Q.  The individual animal data?

21      A.  Again, I don't have it, but if you pull it up

22   on the screen, I'll be able to see it.

23                 THE TECHNICIAN:  Can you remind me of

24   that page number, please?

John Seely, DVM

1              MS. FINKEN:  Sure.  I believe it was

2    on -- if you go to page 764, I can get you there from

3    that.  Hold on.

4              MS. PRZYBYSZ:  I think it's 793.

5              MS. FINKEN:  Let's try 793.

6              THE WITNESS:  Is this the page you're

7    looking at?

8              MS. FINKEN:  No.  Here's the page I'm

9    looking at.  This is fine.

10   BY MS. FINKEN:

11        Q.  This particular page from Appendix B, it

12   gives the individual data listing of histopathology.

13   And I had asked you some questions about Rat 13485.

14   And it indicates here the death date and time of

15   December 30th, 1991, 9:04 p.m., approximate.  Where

16   would that information have come from?

17        A.  That information, I believe, came from our

18   attorneys.

19        Q.  Okay.  So that's data that would have been

20   input into Pristima that was provided by the attorneys

21   from Takeda?

22              MS. PRZYBYSZ:  Lack of foundation.

23         Don't speculate, John.

24              THE WITNESS:  I don't know.  You'd have

John O. Seely, DVM

```
1    to talk to our attorneys or Takeda where that

2    information came from.

3    BY MS. FINKEN:

4        Q.  That's not information that you input into

5    Pristima; correct?

6        A.  Our data technician inputted that data into

7    our computer.

8        Q.  Okay.  And then --

9                MS. FINKEN:  You can take that down.

10   BY MS. FINKEN:

11       Q.  One of the other questions that I had --

12               MS. FINKEN:  If you can pull up,

13   Daniel -- I think Bess just sent it -- it's 126-049,

14   "Unaudited Metadata."

15               THE TECHNICIAN:  I apologize.

16               MS. FINKEN:  Okay.  And we'll mark this

17   as Exhibit 8 [sic] to your deposition.

18       (Exhibit No. 9 was marked for identification.)

19   BY MS. FINKEN:

20       Q.  Dr. Seely, this was provided to us by

21   counsel, and it's titled "EPL-497-019," and it says

22   "Unaudited Metadata."  And there's a signature on the

23   bottom.  It's dated April 8, 2021.  It says "Scans

24   created and QC'ed by ES."  Do you see that?
```

1      A.  Yes.

2      Q.  Have you seen these type of documents before?

3           MS. PRZYBYSZ:  I'm going to stop you.

4           Tracy, who sent this to you and when?

5           MS. FINKEN:  I'm sorry, Andrea,

6   I couldn't hear you.

7           MS. PRZYBYSZ:  I apologize.  Who sent

8   that to you and when?

9           MS. FINKEN:  I have no idea.  I would

10  have to ask my colleagues.  I was just provided to it.

11  Why?

12          MS. PRZYBYSZ:  Okay.  I have a running

13  form objection, because I did not -- and foundation

14  objection.  I haven't seen this document, and I did

15  not send it to you.

16          MS. FINKEN:  Okay.  It had to have been

17  produced by you all at some point, maybe with the

18  expert report.  But I just have a couple of questions

19  about it.

20  BY MS. FINKEN:

21      Q.  Dr. Seely, have you ever seen this type of

22  document before?

23      A.  No, I haven't.

24      Q.  Okay.  So do you know who an ES would be that

John O. Seely, DVM

1                    MS. FINKEN:  That means you're free to

2    go.  We can go off the record.

3                    THE VIDEOGRAPHER:  Okay.  The time is

4    3:54 p.m.  Off the record.

5      (Whereupon, at 3:54 p.m., the deposition ceased.

6                    Signature was reserved.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                ACKNOWLEDGMENT OF DEPONENT

 2           I, JOHN C. SEELY, DVM, do hereby acknowledge

 3   that I have read and examined the foregoing testimony,

 4   and the same is a true, correct and complete

 5   transcription of the testimony given by me and any

 6   corrections appear on the attached errata sheet signed

 7   by me.

 8

 9   _____      _____

10        (DATE)                        (SIGNATURE)

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1                        E R R A T A

2

3      WITNESS NAME:  JOHN C. SEELY, DVM

4

5      PAGE   LINE        CHANGE              REASON

6      _____  _____  _____  _____

7      _____  _____  _____  _____

8      _____  _____  _____  _____

9      _____  _____  _____  _____

10     _____  _____  _____  _____

11     _____  _____  _____  _____

12     _____  _____  _____  _____

13     _____  _____  _____  _____

14     _____  _____  _____  _____

15     _____  _____  _____  _____

16     _____  _____  _____  _____

17     _____  _____  _____  _____

18     _____  _____  _____  _____

19     _____  _____  _____  _____

20     _____  _____  _____  _____

21     _____  _____  _____  _____

22     _____  _____  _____  _____

23     _____  _____  _____  _____

24     _____  _____  _____  _____

John C. Seeley, DVM

```
1    STATE OF NORTH CAROLINA    )

                               )  C E R T I F I C A T E

2    COUNTY OF ORANGE          )

3           I, Sophie Brock, Registered Diplomate

4    Reporter, Certified Realtime Reporter, and Notary

5    Public, the officer before whom the foregoing proceeding

6    was conducted, do hereby certify that the witness,

7    located in Durham County, North Carolina, whose

8    testimony appears in the foregoing proceeding, was duly

9    sworn by me via videolink, according to the emergency

10   video notarization requirements contained in

11   G.S. 10B-25; that the testimony of said witness was

12   taken by me to the best of my ability and thereafter

13   transcribed under my supervision; and that the foregoing

14   pages, inclusive, constitute a true and accurate

15   transcription of the testimony of the witness.

16          I do further certify that I am neither counsel

17   for, related to, nor employed by any of the parties to

18   this action, and further, that I am not a relative or

19   employee of any attorney or counsel employed by the

20   parties thereof, nor financially or otherwise interested

21   in the outcome of said action.

22          This, the 13th day of September, 2021.

23          ____Sophie Brock_____

            Sophie Brock, RDR, CRR

24          Notary Number: 200834000001
```