UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: PROTON-PUMP INHIBITOR PRODUCTS LIABILITY LITIGATION<br><br>**This Document Relates to:**<br><br>*Bales v. AstraZeneca Pharmaceuticals LP*, 2:17-cv-06124 | 2:17-MD-2789 (CCC) (LDW)<br>(MDL 2789)<br><br>Judge Claire C. Cecchi |

REPORT AND RECOMMENDATION
OF SPECIAL MASTER ELLEN REISMAN
REGARDING PLAINTIFF BALES'S MOTION
TO DISQUALIFY DR. ANDREA LEONARD-SEGAL

Takeda Pharmaceutical Company Limited, Takeda Pharmaceuticals America, Inc., Takeda Development Center Americas, Inc. f/k/a Takeda Global Research & Development Center, Inc., and Takeda Pharmaceuticals U.S.A., Inc. ("Takeda") proposes to offer Dr. Andrea Leonard-Segal, a former officer of the U.S. Food and Drug Administration ("FDA"), as an expert offering opinions regarding the regulatory requirements and proceedings with respect to Prevacid, a prescription proton pump inhibitor ("PPI") drug taken by Plaintiff Freddie Bales. Dr. Leonard-Segal's proposed testimony includes "opinions about the labeling of" Prevacid, the "regulatory history of Prevacid," and Prevacid's "label content in the context of the federal regulatory framework focusing on the actions that FDA took regarding

kidney warnings, when they took them and why."[1]  The Plaintiffs' Steering Committee ("PSC") has moved on behalf of Plaintiff Bales to disqualify Dr. Andrea Leonard-Segal from testifying, contending that in light of Dr. Leonard-Segal's past role at FDA, her proposed testimony is barred by 18 U.S.C. § 207, a federal conflict of interest statute.[2]

I.  **FACTUAL AND STATUTORY BACKGROUND**

   **A.  Dr. Leonard-Segal's Work at FDA**

As a Team Leader and the Division Director of FDA's Division of Nonprescription Clinical Evaluation from 2002-13, Dr. Leonard-Segal "was intimately involved with proton-pump inhibitors and the FDA's approval of Prilosec and Prevacid for over-the-counter use" and "oversaw the labeling of these drugs, the adequacy of the warnings, and any changes to the labels."[3]  As she stated in her expert report, she "oversaw the approval of the Prevacid switch (NDA 22-327) to OTC marketing status in 2009."[4]

---

[1] Takeda Defendants' Response to Pls.' Mot. to Exclude Expert Testimony of Dr. Andrea Leonard-Segal, Ex. A at 1 [hereinafter, "Leonard-Segal Expert Report"] ECF. No. 88-2.
[2] PSC's Mem. of Law in Supp. of Mot. to Disqualify Takeda Defense Expert Dr. Andrea Leonard-Segal 11-13, No. 2:17-MD-2789, ECF No. 701 [hereinafter PSC's Mem. to Disqualify Leonard-Segal].
[3] *Id.* at 2.
[4] Leonard-Segal Expert Report 4.  "Prescription to OTC switch refers to over-the-counter marketing of a product that was once a prescription drug product, for the same dosage form, population, and route of administration." *See Small Business Assistance: Frequently Asked Questions on the Regulatory Process of Over-the-*

### B.  18 U.S.C. § 207

Section 207 prohibits:

> [A former] officer or employee . . . of the executive branch of the United States (including any independent agency of the United States), …[from] knowingly mak[ing], with the intent to influence, any communication to or appearance before any . . . court . . . of the United States . . . on behalf of any other person . . . in connection with a particular matter:
> (A) in which the United States ... has a direct and substantial interest,
> (B) in which the person participated personally and substantially as such officer or employee, and
> (C) which involved a specific party or specific parties at the time of such participation . . . .[5]

With respect to expert witnesses, Section 207(j) expressly provides that a former employee subject to the prohibitions set forth above "may not, except pursuant to court order, serve as an expert witness for any other person (except the United States) in that matter[.]"[6]

## II.  ANALYSIS AND DISCUSSION

The PSC contends that Dr. Leonard-Segal's testimony is prohibited by Section 207 because (1) FDA regulation of PPIs is a particular matter in which the FDA has a direct and substantial interest; (2) Dr. Leonard-Segal participated

---

*Counter (OTC) Drugs*, Food & Drug Admin. (Feb. 24, 2020), https://www.fda.gov/drugs/cder-small-business-industry-assistance-sbia/small-business-assistance-frequently-asked-questions-regulatory-process-over-counter-otc-drugs.
[5] 18 U.S.C. § 207(a)(1)(A)-(C).
[6] 18 U.S.C. § 207(j)(6)(A).

3

personally and substantially in that regulation while at FDA; and (3) FDA regulation of PPIs involved specific parties, including PPI manufacturers and their predecessors or affiliates.[7]

Takeda asserts that the FDA approval process for OTC drugs is sufficiently distinct from that for prescription drugs, such as the Prevacid at issue in Plaintiff Bales's lawsuit, that the two are not the same particular matter, so neither the statutory prohibition nor the requirement for court approval of expert testimony is triggered.[8]

There are relatively few cases interpreting and applying Section 207. Neither the parties nor the Special Master have identified any cases applying Section 207 to a former FDA employee who proposes to testify in a product liability lawsuit regarding a prescription drug with the same active ingredient and indications as a later-approved OTC pharmaceutical product that the employee reviewed while at FDA. On its face, however, the proposed distinction between the prescription and OTC products appears thin, particularly in the context of the facts of this case.

---

[7] PSC's Mem. to Disqualify Leonard-Segal 31-37.
[8] Def.'s Mem. of Law in Opp'n to the PSC's Mot. to Disqualify Takeda Regulatory Expert Dr. Andrea Leonard-Segal 15-17, ECF No. 89 [hereinafter Takeda's Mem. in Opp'n of Leonard-Segal Disqualification].

### A. "Particular Matter": The Overlap In FDA Regulatory Processes For Prescription Drugs And Their Over-The-Counter Counterparts

Dr. Leonard-Segal, in her report, identifies "two regulatory mechanisms by which a drug can be marketed in the United States. One is via prescription and the other is via nonprescription (otherwise known as over-the-counter [OTC])."[9] However, as Dr. Leonard-Segal explains, these two regulatory mechanisms operate in similar fashion:

> The approval processes for OTC products are identical to the prescription NDA and ANDA processes and must abide by most of the same codified requirements. OTC NDA submissions contain additional studies related to consumer comprehension and behavior that are not part of prescription NDA submissions.[10]

Dr. Leonard-Segal stated that she "oversaw the approval of the Prevacid switch (NDA22-327) to OTC marketing status in 2009" and "co-authored the summary basis for regulatory action document with the Director of the Division of Gastroenterology Products."[11] As such, she was involved in a "comprehensive FDA review of all safety data. . . . [that] included data acquired in clinical trials, all postmarketing data from the sponsor, the FDA's adverse event reporting system, and . . . a review of safety information on lansoprazole from the published medical

---

[9] Leonard-Segal Expert Report 7.
[10] *Id.*
[11] *Id.* at 4.

literature."[12] Thus, Dr. Leonard-Segal's report makes clear that the review for Prevacid OTC approval included the review of safety data related to the prescription version of the drug.[13]

Moreover, in her expert report, Dr. Leonard-Segal emphasized how closely regulators of prescription drugs and regulators of their OTC counterparts work together with respect to safety issues.

> It is important to clarify how the relevant prescription division, OTC division and OSE [FDA's Office of Safety and Epidemiology] interact to research new safety information. The prescription division informs the OTC division of any new safety information that has come to their attention and that they are considering including on the prescription label of a product that is also marketed OTC (and vice versa). The two divisions work together with OSE to explore and evaluate the safety information. Ultimately the prescription division determines what will be placed on the prescription label and the OTC division determines what will be placed on the OTC label.[14]

### B. Agency "Direct And Substantial Interest"

Takeda's argument that Section 207 is not implicated because this is private civil litigation in which FDA is not a party is not dispositive.[15] The Section 207(a)(1)(A) requirement that a "particular matter" be one in which "the United States . . . has a direct and substantial interest" can be fairly read to be sufficiently

---

[12] *Id.*
[13] *See id.*
[14] *Id.* at 19.
[15] Takeda's Mem. in Opp'n of Leonard-Segal Disqualification 12-14.

broad to encompass the circumstances at issue in Plaintiff Bales's motion. FDA surely has an interest in the legitimacy and integrity of its drug approval proceedings and drug safety analyses, such as those in which Dr. Leonard-Segal participated and which are directly at issue in this litigation.

### C. "Personal And Substantial Participation"

In this case, the "personal and substantial participation" analysis largely overlaps with the "particular matter" analysis. There is no dispute that Dr. Leonard-Segal participated personally and substantially in FDA regulation of OTC PPIs, including the review of drug safety issues. The question is whether her personal and substantial participation in FDA regulation of the OTC version of Prevacid is part of the same "particular matter" as its regulation of prescription Prevacid. As discussed above, those regulatory activities certainly appear to be sufficiently interrelated to constitute the same "particular matter."

Moreover, there is some evidence that Dr. Leonard-Segal may have personally and substantially participated in data analysis with respect to both prescription and OTC PPIs regarding potential warnings about kidney damage. Dr. Leonard-Segal testified that she may have been involved in FDA's review of a 2011 Citizen Petition seeking a warning for acute interstitial nephritis ("AIN") on all PPI labels.[16] Additionally, she testified that she may have been involved in the review

---

[16] *See* PSC's Mem. to Disqualify Leonard-Segal, Ex. 2 at 78:11-:20, No. 2:17-md-

7

of a Tracked Safety Issue ("TSI") concerning the relationship between PPIs and AIN.[17] A TSI is initiated by FDA when it identifies a signal from its adverse event reporting system that a drug may be associated with a potential risk.[18] To the extent she was involved with either of these regulatory reviews, she would have been involved in a regulatory process involving both prescription and OTC PPIs.

### D. Office Of Government Ethics Regulations

Takeda relies on Office of Government Ethics ("OGE") regulations interpreting Section 207.[19] At oral argument, Takeda raised for the first time Example 5 to paragraph (h)(2) of those regulations, to argue that Section 207 does not apply here because Dr. Leonard-Segal did not substantially and personally participate in the same particular matter.[20] But the OGE regulations, including Example 5, are not conclusive on the issue. Indeed, as Takeda's counsel conceded at oral argument, the fact pattern presented here is "something of an unprecedented issue."[21]

First, contrary to Takeda's suggestion, it is not clear that OGE regulations

---

2789, ECF No. 701-2 [hereinafter Leonard-Segal Dep.]; *see* Leonard-Segal Expert Report 5, 19-21.
[17] Leonard-Segal Dep. 75:16-76:8.
[18] *See* Leonard-Segal Expert Report 13.
[19] 5 C.F.R. § 2641.201.
[20] *See* Oral Args. 222:13-19, April 4, 2022, attached hereto in pertinent part as Ex. 1. Example 5 was not cited in Takeda's Memorandum in Opposition to the PSC's Motion or addressed by the PSC in its filings.
[21] Oral Args. 211:23-24, Apr. 4, 2022.

interpreting criminal conflict of interest statutes are entitled to deference under *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*[22] *Chevron* deference applies where an agency is interpreting an ambiguous congressional statute that the agency is charged with interpreting and enforcing.[23] However, the OGE does not actually enforce the criminal conflict of interest statutes, and at least three United States Supreme Court Justices have concurred that its interpretations are "not even deserving of any persuasive effect."[24] The lone District Court case cited by Takeda in support of its *Chevron* argument is inapposite. It has nothing to do with federal conflict of interest law, OGE, or FDA; rather, it involves a Department of Homeland Security interpretation of immigration law.[25]

Second, even if the OGE regulation were entitled to some weight, it must be read in its entire context. Subsection (h) of the regulation, "***Particular matter involving a specific party or parties***," is followed by a further sub-paragraph (1), which reads in pertinent part as follows:

> (1) **Basic concept.** The prohibition applies only to communications or appearances made in connection with a "particular matter involving a specific party or parties." Although the statute defines "particular matter" broadly to include "any . . . request for a ruling or

---

[22] 467 U.S. 837 (1984). *See* Takeda's Mem. in Opp'n of Leonard-Segal Disqualification 11.
[23] *See Chevron*, 467 U.S. at 865-66.
[24] *Crandon v. U.S.*, 494 U.S. 152, 177 (Scalia, J., O'Connor, J. & Kennedy, J., concurring).
[25] Takeda's Mem. in Opp'n of Leonard-Segal Disqualification 11 (citing *Aybar v. Johnson*, 295 F. Supp. 3d 442, 454 (D.N.J. 2018)).

> determination" . . . only those particular matters that involve a specific party or parties fall within the prohibition of section 207(a)(1). Such a matter typically involves a specific proceeding affecting the legal rights of the parties or an isolatable transaction or *related set of transactions* between identified parties, s*uch as a specific . . . product approval application.*"[26]

On its face, this language suggests that a related set of transactions involving product approval can be a "particular matter."

Example 5 cited by Takeda is associated not with the above-quoted sub-paragraph (1) of sub-section (h) defining the "basic concept," but instead with the following sub-paragraph (2) "***Matters of general applicability not covered.***"[27] Example 5 to sub-paragraph (2) reads as follows:

> Example 5 to paragraph (H)(2): An employee of the Food and Drug Administration (FDA) drafted a proposed rule requiring all manufacturers of a particular type of medical device to obtain pre-market approval for their products. It was known at the time that only three or four manufacturers currently were marketing or developing such products. However, there was nothing to preclude other manufacturers from entering the market in the future. Moreover, the regulation on its face was not limited in application to those companies already known to be involved with this type of product at the time of promulgation. Because the proposed rule would apply to an open-ended class of manufacturers, not just specifically identified companies, it would not be a particular matter involving specific parties. After leaving Government, the former FDA employee would

---

[26] 5 C.F.R. § 2641.201(h)(1) (2022) (emphasis added).
[27] 5 C.F.R. § 2641.201(h)(2) (emphasis added).

not be prohibited from representing a manufacturer in connection with the final rule or the application of the rule in any specific case.[28]

Both Example 5's location and its substance demonstrate that it is not dispositive of the issue in this case. It is an example of a "matter of general applicability" under sub-section (h)(2). But, approval of a particular drug and its labeling—whether a prescription drug or an OTC version of that drug after consideration of safety and regulatory data regarding the prescription version—is not the promulgation of a rule of general application. Rather it is a specific proceeding affecting legal rights of identified parties as discussed in sub-section (h)(1). In short, on its face, Example 5 of the OGE regulations does not resolve this "unprecedented issue."[29]

### E. FDA's Views Are Unknown

This analysis is necessarily limited to considering the statutory language, the OGE regulations, and limited case law because the views of FDA, which is charged with reviewing and approving drug applications, and the U.S. Department of Justice, which is charged with enforcing criminal statutes such as 18 U.S.C. §207, on the issue are unknown. Indeed, it appears from the record that FDA may be unaware of Dr. Leonard-Segal's proposed expert testimony.[30]

---

[28] *Id.* at Example 5 to Paragraph (H)(2).
[29] *See* Oral Args. 211:23-24, Apr. 4, 2022.
[30] *Id.* at 202:18-23, 211:10-15, 216:20-217:2.

Section 207(j)(6)(a) imposes on federal courts a gatekeeping function with respect to experts covered by the statute. It provides that a former employee subject to Section 207's prohibitions "may not, except pursuant to court order, serve as an expert witness for any other person (except the United States) in that matter."[31]

Given the statute's assignment of authority to the Court, I recommend that the Court authorize me to contact the Office of the Chief Counsel of FDA to inform it of the proposed expert testimony and the pending motion to disqualify, to provide it with relevant supporting materials, and to request it to advise the Special Master of FDA's views, which the Special Master shall provide to the Court and the parties. FDA's opinion will provide additional context and clarity for the Court's and the parties' benefit. Once that has occurred, full consideration of the motion and opposition can proceed as necessary on a fully informed basis.[32]

---

[31] 18 U.S.C § 207(j)(6)(A); *see also* Oral Args. 207:9-14, Apr. 4, 2022 ("The regulation exception built into the statute specifies that if those initial three criteria that are required for a finding disqualification under the statute apply, then there is an obligation to affirmatively seek permission from the court to testify.").

[32] Because determination of the disqualification motion may or may not render moot Plaintiff Bales's *Daubert* motion to exclude Dr. Leonard-Segal's testimony, I recommend waiting to address that after resolution of the disqualification motion.

A proposed order is attached.

                                          Respectfully submitted,

                                          _____

                                          ELLEN K. REISMAN
                                          Special Master